FILED
02/22/2017
Clerk of the
Appellate Courts



# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2017

## JANELL MORTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-02408          Lee V. Coffee, Judge

_____

## No. W2016-00478-CCA-R3-PC

_____

The Petitioner, Janell Morton, appeals the denial of her petition for post-conviction relief in which she challenged her guilty pleas to attempted first degree murder and especially aggravated kidnapping and her effective sentence of thirteen and one-half years.  On appeal, the Petitioner contends that she was denied her right to the effective assistance of counsel and that as a result, her pleas were unknowing and involuntary.  We affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, Janell Morton.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Petitioner was indicted on attempted first degree murder, especially aggravated kidnapping, and aggravated assault.  She entered pleas pursuant to *Alford v. North Carolina*, 400 U.S. 25 (1970), to attempted first degree murder and especially aggravated kidnapping.  Pursuant to the plea agreement, the trial court sentenced the Petitioner to thirteen years and six months at twenty percent for the attempted first degree

murder conviction and thirteen years and six months at one hundred percent for the especially aggravated kidnapping conviction, both to be served concurrently with the other.

### Plea Submission Hearing

The Petitioner stipulated to the following facts underlying her pleas at the plea submission hearing. Police officers responded to the crime scene where they found the victim who informed them that the Petitioner "held [him] at gunpoint for over an hour." The victim explained that while he was sleeping, the Petitioner approached him with a gun, "pointed it at him, and threatened to kill him." During the course of these events, the Petitioner called the victim's mother who was able to hear the Petitioner's threats over the phone. The victim informed the police officers "that he was able to grab the gun and get away."

At the plea hearing, the Petitioner affirmed to the trial court that she did, in fact, sign and understand the waiver of rights and plea agreement; that trial counsel met with the Petitioner "at least two or three days" during the week before the trial date and "[f]or very long periods of time"; that she wanted to plead pursuant to the agreement, noting that it was in her "best interest and for [her] family"; that she had the right to proceed to trial, present a defense, and call witnesses; and that she was under oath and required to tell the truth under threat of perjury.

The trial court then asked the Petitioner the following questions:

THE COURT: Now, by entering this guilty plea … you are waiving, you are giving up those rights. You're asking this Court to find you guilty without a trial and to set this punishment which has been recommended on this case.

Now … is that what you want to do, ma'am?

THE [PETITIONER]: I've been so confused.

…

THE COURT: What do you have questions about, ma'am?

THE [PETITIONER]: That enough was done and investigated and...

- 2 -

THE COURT: … [L]et me talk to you a little bit more about your rights, and if there's any questions that you want to ask of me, make sure you ask them and make sure - because I want you to make sure you understand everything that's going on in Court today. Okay?

THE [PETITIONER]: Yes.

After further explanation and questioning by the trial court, the Petitioner did not reiterate her confusion and affirmed that she understood what the court had gone over with her. The Petitioner stated that she faced a "little pressure" from trial counsel to accept the plea offer, explaining that trial counsel was "[j]ust being really adamant about if it went to trial, [she would] probably be convicted." The Petitioner also expressed concern that she was not mentally stable, and the trial court responded by explaining that she would "be placed in a mental health unit and … get treatment." After the trial court asked the Petitioner whether she was still confused about anything discussed during the colloquy, the Petitioner stated that she understood everything and did not have any further questions. The Petitioner stated that she thought that "to have an in-depth mental evaluation and to have an investigator placed on this" would have been additional steps that trial counsel could have taken on her behalf. The trial court responded to the Petitioner's desire for additional mental evaluations, stating that she was already deemed competent by West Tennessee Forensic Services during an initial mental evaluation. Accordingly, the trial court accepted the Petitioner's guilty plea.

## Post-Conviction Hearing

The Petitioner testified that trial counsel met with her on only one occasion. She also testified that although she had "a few phone calls" with trial counsel, trial counsel was "really short on the phone." The Petitioner stated that when they met, the Petitioner requested a mental evaluation and trial counsel explained that she was evaluating whether the "battered women's defense" would apply to her. The Petitioner did not believe she qualified for the battered women's defense because she had not been physically abused. She also stated that she underwent a mental evaluation for the purpose of determining competency to stand trial. She testified that she was receiving counseling, group therapy, and medication while incarcerated.

The Petitioner asserted that during court appearances, trial counsel would not discuss the case with her in detail. She stated that three days before the trial date, she pled guilty. She explained that she met with trial counsel the day before the guilty plea submission hearing. During that meeting, trial counsel told the Petitioner that because of the 911 phone call recording, she could not pursue a "battered woman defense." The Petitioner testified that she requested another mental evaluation but that trial counsel

would not request additional funding for another evaluation, concluding that it would not be helpful after the determination that she was competent to stand trial.

The Petitioner said that trial counsel asked her, "'Are you suicidal?' and I said, 'No, ma'am.' I said, 'I've thought about it,' and she just immediately jumps up and burst out of the room and starts hollering in the hallway, 'Lock her up, lock her up. She's suicidal. She's suicidal.'" She stated that prison personnel responded to the incident by concluding the Petitioner was not in fact suicidal and by escorting trial counsel out of the facility.

The next time the Petitioner and trial counsel met was one day before the guilty plea submission. The Petitioner testified that trial counsel told her that the State's best offer was a thirteen and half year sentence. She asserted that she was "confused" and "felt pressured" during the plea submission. She stated that trial counsel told her that if convicted at trial, she would be sentenced to fifty-six years, which is the maximum, because the trial court judge was up for re-election.

On cross-examination, the Petitioner denied having knowledge that her "sister sent an e-mail based on a conversation that [she] had with her," regarding a plea bargain. She testified that at the plea colloquy, she informed the trial court that she felt pressured by trial counsel to accept the plea bargain and that she "believe[d] [her] mental state at the time was not very good." She admitted that trial counsel explained to her the rights that she had and that she understood her rights. She also admitted that she had given conflicting testimony between the guilty plea submission hearing and the post-conviction relief hearing. She again stated that she was "intimidated and frightened by [her] attorney and did not know what else to do." The Petitioner stated that although she told the trial court that the guilty plea was in her and her family's best interest, she did not believe she could reject the guilty plea agreement. She also stated that although she expressly told the trial court that she did not want a jury trial at the guilty plea submission hearing, she told the post-conviction court that she did, in fact, want a jury trial.

On re-direct examination, the Petitioner testified that she felt that her anxiety, depression, and post-traumatic stress disorder, along with the medication she took for her conditions, caused her mental state to suffer.

Trial counsel testified that she met with the Petitioner seven times before the week of the trial, three days the week before the trial date, and the day of the guilty plea submission hearing. She stated that "there were also numerous phone calls that [the Petitioner] made to [her]" and that she spoke with the Petitioner's family several times. She testified that she had West Tennessee Forensic Services conduct both current competency and insanity at the time of the offense evaluations on the Petitioner. She also

- 4 -

testified that the evaluations revealed that the Petitioner was competent to stand trial and "did not have an insanity defense." Trial counsel stated that if a competent defendant could have an additional mental health defense, she believed that requesting additional funds for other mental evaluations would be appropriate. She testified, however, that the Petitioner did not indicate any signs that could have supported such a request.

Trial counsel testified that the State's original plea offer was to sentence the Petitioner to fifteen years in prison and that the State's decision to lower the sentence to thirteen and one-half years occurred "[w]ithin a couple of days before she pled." Trial counsel stated that she only received the State's second offer after the Petitioner asked if she could plead guilty. Trial counsel also stated that she received an email from the Petitioner's sister regarding the Petitioner's desire to plead guilty. She explained that during the week before the trial date, she brought the Petitioner to the courthouse several times to discuss the case, review her testimony, and allow her to get comfortable in the courtroom. Trial counsel testified that although she did not have a problem taking the Petitioner's case to trial, she did not believe it was in the Petitioner's best interest.

On cross-examination, trial counsel testified that she first believed it was in the Petitioner's best interest to proceed to trial because of "the possibility of a battered women's" defense, considering the Petitioner's history of abuse. Trial counsel's opinion changed, however, after a doctor with West Tennessee Forensic Services, Dr. Lynn Zager, determined the Petitioner was not suffering battered woman syndrome. She stated that "Dr. Zager thought [the possible defense of acting under extreme provocation or passion] was a much better fit for the fact scenario." When trial counsel was preparing the Petitioner for trial during the week before the trial date, the Petitioner gave a version of events that "was not the same as the story that she had given [trial counsel] before." Trial counsel concluded that "[i]t would not have been a story that we would have wanted the jury to hear" and that "the only person [trial counsel] had to put forward as to what happened that night was [the Petitioner]." Trial counsel testified that although the Petitioner was a "dream client" for being fifty-one-years-old and having no record, she was very concerned over what might come out upon cross-examination of the Petitioner because her story "went from self-defense to" a defense of emotional abuse. Trial counsel stated that after the Petitioner offered trial counsel the incriminating version of events, the Petitioner "asked [] if she could still enter a guilty plea." She also stated that she obtained the Petitioner's assurance that she wanted to plead guilty and then asked the trial court to allow her to plead guilty and not proceed to trial, which the court ultimately agreed to do. She denied that the Petitioner ever expressed a desire to go to trial after she decided to plead guilty or that she pressured the Petitioner into pleading guilty.

In response to questioning by the post-conviction court, trial counsel testified that when the Petitioner informed her that she had suicidal thoughts, trial counsel took her

statement "very seriously" and informed the jailhouse staff of her statements. She insisted that she "was not escorted out of the jail" but rather "had somebody walk with [her] to make sure [she] did not get lost."

At the conclusion of the proof, the post-conviction court found that the Petitioner's statement that she "never really had an offer until right before trial" was "absolutely not true." The post-conviction court noted that "[t]his is, in fact, a classic case of … 'buyer's remorse.'" The post-conviction court recalled that the Petitioner rejected the State's original plea offer of fifteen years at one-hundred percent, finding she said, "I do [not] want that offer. I'm not guilty. I want a trial." The post-conviction court found that the Petitioner was either "misremembering" or "not telling the truth," regarding how many times trial counsel met with her and noting that trial counsel spent many hours and days the week before the trial date with the Petitioner going over her potential testimony. The post-conviction court noted that during the plea colloquy, the trial court "covered [the Petitioner's] right[s] with her ad nauseam." The post-conviction court explained to the Petitioner that she received her requested mental evaluation, insisted that she would have received a second evaluation if there was any good faith basis for a second evaluation, and found that neither the trial court nor trial counsel had any reason to believe that the Petitioner was not competent. The post-conviction court also found that the Petitioner failed to present evidence of what the results of a second mental evaluation would have revealed and, thus, failed to present proof of prejudice. The post-conviction court credited trial counsel's account of the incident involving the Petitioner expressing suicidal thoughts at the jailhouse. The post-conviction court also credited trial counsel for advising the Petitioner to plead guilty after the different version of events came out the week before the trial date. The post-conviction court found "conclusively that Ms. Morton has not told the truth" and that trial counsel was "being honest with the Court." The post-conviction court noted that the Petitioner "exposed herself to the possibilities of aggravated perjury" while giving her testimony at the post-conviction hearing. Ultimately, the post-conviction court entered an order denying the Petitioner post-conviction relief.

## ANALYSIS

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*,

297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *Alford*, 400 U.S. at 31). To succeed in a challenge for ineffective assistance of counsel, the petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient representation and (2) prejudice resulting from the deficiency. In the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). To fairly assess counsel's conduct every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Burns*, 6 S.W.3d at 461. "A trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id.* at 458.

Here, the Petitioner argues that trial counsel "knew or should have been aware of [the Petitioner's] lack of mental capacity to understand what was going on" because the Petitioner was supposedly under pressure, was on medication, and could not recall how often she met with trial counsel. The post-conviction court found, however, that the Petitioner's testimony was not reliable and that the Petitioner had the requisite mental capacity to plead, considering the mental evaluation that determined the Petitioner was competent to stand trial. The post-conviction court also found that trial counsel met with

the Petitioner extensively leading up to the Petitioner's decision to waive her jury trial and that trial counsel had not exerted improper pressure on the Petitioner. The trial court spent considerable time during the Petitioner's plea colloquy explaining the plea to her, answering her questions, and addressing her confusion on certain issues. Ultimately, the Petitioner concluded she was satisfied with the plea and determined it was in her best interest to accept the plea. We conclude that the evidence fails to establish that trial counsel was deficient or that any deficiency resulted in prejudice.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE